CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

8/12/2025
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
        DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | |
|---|---|
| ERIKA WOOLFOLK<br>Lynchburg, Virginia<br>   *Plaintiff,* | )<br>)<br>)<br>) |
| v. | )<br>) |
| LIBERTY UNIVERSITY<br>1971 University Blvd.<br>Lynchburg, Virginia 24515 | ) Case No. 6:25cv00059<br>)<br>)<br>) |
| and | )<br>) |
| ASHLEY REICH, individually,<br>5 Wendover Square<br>Lynchburg, Virginia 24503 | )<br>)<br>)<br>) |
| Serve (By Agreement of Counsel):<br>King Tower, Esquire<br>Woods Rogers Vandeventer Black PLC<br>10 South Jefferson Street, Suite 1800<br>Roanoke, Virginia 24011 | )<br>)<br>)<br>)<br>) |
|    *Defendant* | )<br>)<br>) |

## COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

 **COMES NOW**, Plaintiff Erika Woolfolk, by and through counsel, Neil L. Henrichsen of Henrichsen Law Group, PLLC, and hereby files this action against Defendants Liberty University and Ashley Ann Reich, and for cause states:

## NATURE OF ACTION

 1. Plaintiff, Erika Woolfolk (hereinafter "Ms. Woolfolk" or "Plaintiff"), brings this action against Defendants Liberty University, Inc. (hereinafter "Liberty" or "the University") and Ashley Ann Reich, in her individual capacity (hereinafter "Ms. Reich") (collectively "Defendants") for declaratory, injunctive, and equitable relief, as well as monetary damages, to

redress Defendants' unlawful employment practices, including discriminatory disparate treatment and harassment of Plaintiff due to her race, denial of equal employment opportunities, creation of a hostile work environment, and unlawful retaliation against her after she engaged in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the Virginia Whistleblower Protection Law, Virginia Code § 40.1-27.3.

2.      This case arises from Liberty University's discrimination against Ms. Woolfolk, a Black woman who served as a Civil Rights Investigator in the University's Office of Equity and Compliance/Title IX, an office ironically intended to enforce such laws under which these claims arise, from July 2018 until her wrongful termination in June 2024.

3.      Throughout her employment, Ms. Woolfolk was subjected to racially discriminatory and hostile treatment, denied promotions and advancement opportunities in favor of less qualified white employees, assigned disproportionate workloads, denied remote work privileges afforded to white colleagues, and ultimately terminated in retaliation for her cooperation with federal investigations and her complaints about discriminatory and unlawful conduct by University officials.

4.      Ms. Woolfolk was a dedicated employee and student of Liberty University.

5.      Ms. Woolfolk made good faith reports to her Liberty officials and outside agencies of multiple violations of federal law under Title IX, including sexual harassment of her coworkers within the Office of Equity and Compliance/Title IX, non-compliance with grievance procedures required under Title IX, violations of Liberty's reporting obligations under the Clery Act, 20 U.S.C. § 1092(f), and race discrimination.

6.      Over the course of her employment, Ms. Woolfolk was held to a higher standard than her peers because it was believed that she "could handle it," failing to consider that this apparent compliment, in fact, imposed burdens on Ms. Woolfolk that were not imposed on her similarly-situated White investigators.

2

7.      This case exemplifies the unique challenges faced by Black women in employment discrimination litigation.[1] Research demonstrates that Black women are typically less likely to be believed than Black men when making workplace discrimination accusations,[2] requiring courts to carefully examine the coded racism and unconscious biases that specifically target Black women in the workplace. *Harris v. Mayorkas*, 2023 U.S. Dist. LEXIS 131317, at *9-10, n. 3 (E.D. Va. July 17, 2023), *citing Lam v. University of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994) (holding that – because a person's identity "cannot be neatly reduced to distinct components" – "the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences).

8.      As courts have recognized, Black women are subject to unique stereotypes that neither Black men nor White women must endure. *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014); *Zaire v. Protective Training Acad., LLC*, 2019 U.S. Dist. LEXIS 90473, at 18-19 (D. Md. May 19, 2019); *Jeffers v. Thompson*, 264 F.Supp.2d 314, 326 (D. Md. 2003). The discriminatory treatment Ms. Woolfolk experienced reflects workplace manifestations of historical stereotypes rooted in slavery-era laws that dehumanized Black people, creating lasting patterns of coded language and microaggressions that persist in modern employment settings.

9.      Central to this case is the "strong black woman" stereotype—a harmful myth derived from slavery-era beliefs that Black women are inherently more capable of enduring

---

[1] Peggie R. Smith, *Separate Identities: Black Women, Work, and Title VII*, 14 Harv. Women's L.J. 21 (1991) (emphasizing the need to examine African American women's claims of "interactive" race-and-gender discrimination within a socio-historical framework); Kufere Laing, *Interpreting the People's Constitution*, 65 How. L.J. 533, 557-67 (2022) (setting out an interpretive framework for Title VII claims that considers the unique experiences of Black women and other intersectional plaintiffs).

[2] Black women are believed less than others regarding discrimination claims. looking at EEOC data from 2011 to 2016 for gender cases and 2010 to 2017 for race cases. Dr. Ashleigh Shelby Rosette found that Black women who were granted financial compensation after being discriminated against were awarded *less* money compared to White women for gender discrimination, but *more* money than Black men who endured racial discrimination.

hardship and require less support than others.[3] This stereotype, which falsely portrays excessive burdens as compliments about capability, begins in childhood where Black girls routinely receive harsher treatment and face higher expectations.[4] Ms. Woolfolk's experience—being assigned disproportionately heavy caseloads because supervisors "knew she could handle it"—exemplifies how this discriminatory stereotype operates in the modern workplace.

10.    This discriminatory stereotype manifests in workplace practices that systematically disadvantage Black women: expecting them to work without adequate resources, subjecting them to harsher criticism while providing less praise, demanding they work harder than white peers, and creating circumstances where Black women are consistently expected to achieve more with less support.[5] These patterns, evident throughout Ms. Woolfolk's employment, reflect institutionalized discrimination rather than individual performance issues.

11.    The insidious nature of this discrimination lies in how excessive burdens are disguised as recognition of capability, making it difficult for victims to recognize exploitation. When employers assign disproportionate responsibilities under the guise of trust in an employee's abilities, they mask discriminatory treatment as professional compliments, creating a psychological barrier that prevents Black women from recognizing and challenging their mistreatment.

---

[3] Kelly Yu-Hsin Liao, Meifen Wei, Mengxi Yin, *The Misunderstood Schema of the Strong Black Woman: Exploring Its Mental Health Consequences and Coping Responses Among African American Women,* PSYCHOLOGY OF WOMEN QUARTERLY (Oct. 29, 2019) (describing the idea of the "strong black woman" as an instance of gendered racism offered as an alternative to other negative stereotypes, including "the domineering Sapphire; the hypersexual Jezebel; the nurturing, asexual Mammy for European American families; and the dependent Welfare Queen").

[4] 2017 Georgetown Center on Poverty and Inequality; Girlhood Interrupted: The Erasure of Black Girls' Childhood https://genderjusticeandopportunity.georgetown.edu/wp-content/uploads/2020/06/girlhood-interrupted.pdf (accessed July 18,2025); Listening to Black Women and Girls: Lived Experiences of Adultification Bias, https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2019/05/Listening-to-Black-Women-and-Girls.pdf (Accessed July 18, 2025).

[5] *See* Examples in Left Out and Left Behind The Hurdles, Hassles, and Heartaches of Achieving Long-Term Legal Careers for Women of Color (2020).

12.     The discriminatory evaluation of Black women's workplace behavior further demonstrates this systematic bias. When Black women are criticized for inappropriate "tone" or labeled as "pushy," "aggressive," or "not a team player," these descriptors carry coded racial meanings that echo the punishment mechanisms used against Black women during slavery. *Thomas v. Eotech, LLC*, 2014 U.S. Dist. LEXIS 233521, at *4 (D. Md. Dec. 27, 2024). Such racially-charged criticism triggers responses rooted in generational trauma and lifelong experiences of negative stereotyping, creating psychological harm that white women do not experience when receiving similar workplace feedback.

13.     The concept of historical trauma—the cumulative emotional and psychological harm that transcends generations from substantial historical events such as slavery and Jim Crow laws—provides essential context for understanding the profound impact of workplace discrimination on Black women, and Ms. Woolfolk in particular.[6] This internalized trauma amplifies the harm caused by discriminatory workplace practices, making the damages suffered by Ms. Woolfolk both more severe and more complex than those experienced by employees who do not carry this historical burden.

14.     Plaintiff hereby brings this action for relief based upon causes of action arising from violations of Title VII, Section 1981, Title IX, and the Virginia Whistleblower Protection Law.

## PARTIES

15.     Plaintiff Erika Woolfolk ("Ms. Woolfolk" or "Plaintiff") is a Black woman who resides in Lynchburg, Virginia. She was employed by Liberty University from April 2014 through June 26, 2024, serving initially as Associate Producer/Assistant Director for Liberty Flames Sports

---

[6] Listening to Black Women and Girls: Lived Experiences of Adultification Bias, https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2019/05/Listening-to-Black-Women-and-Girls.pdf (Accessed July 18, 2025); Mohatt NV, Thompson AB, Thai ND, Tebes JK. Historical trauma as public narrative: a conceptual review of how history impacts present-day health. Soc. Sci Med. 2014 Apr; 106: 128-36. Doi:10.1016/j.socscimed.2014.01.043. Epub 2014 Jan 31. PMID: 24561774; PMCID: PMC4001826. https://pmc.ncbi.nlm.nih.gov/articles/PMC4001826/pdf/nihms569976.pdf (retrieved July 18, 2025).

Network from April 2014 to July 2018, and then as a Civil Rights Investigator in the Office of Equity and Compliance/Title IX ("OEC/Title IX Office") from July 2018 until her termination on or about June 26, 2024.

16.    Defendant Liberty University, Inc. ("Liberty" or "the University") is a Virginia corporation with its principal place of business located at 1971 University Boulevard, Lynchburg, Virginia 24515. Liberty University is a private Christian university that receives federal financial assistance from the U.S. Department of Education and employs more than fifteen (15) individuals, making it subject to Title VII of the Civil Rights Act of 1964, as amended. The University operates extensive educational programs and activities that receive federal financial assistance, subjecting it to Title IX of the Education Amendments of 1972. At all times relevant to this action, Liberty University was Ms. Woolfolk's employer within the meaning of Title VII, 42 U.S.C. § 1981, and Title IX.

17.    Defendant Ashley Ann Reich ("Ms. Reich") is sued in her individual capacity and, at all times relevant to this action, was employed by Liberty University as Senior Vice President of University Compliance and Senior Vice President of Equity Compliance from October 2022 to sometime in mid-2025. Ms. Reich also served as an Adjunct Instructor for UNIV 101 and UNIV 104 courses at the University. She had supervisory authority over the OEC/Title IX Office, including authority over personnel decisions affecting Ms. Woolfolk such as hiring, promotion, compensation, work assignments, and termination decisions. At all times relevant to this action, Ms. Reich acted within the scope of her employment with Liberty University.

<u>**JURISDICTION AND VENUE**</u>

18.    This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

19.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the Virginia Whistleblower Protection Law, Virginia Code § 40.1-27.3, because such claims are so related to the federal claims as to form part of the same case or controversy.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant Liberty University is located in this District at 1971 University Boulevard, Lynchburg, Virginia 24515, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's employment, the discriminatory conduct complained of, and Plaintiff's wrongful termination.

21.     Defendants are subject to personal jurisdiction in this District because Liberty University conducts substantial business operations in this District, maintains its principal place of business in this District, and the both Defendants committed the acts and omissions alleged herein while acting within the scope of authority in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

22.     Prior to filing this Complaint against Liberty, Ms. Woolfolk filed a Charge of Discrimination with the EEOC on September 18, 2024, alleging both race discrimination and retaliation under Title VII, which was assigned Charge No. 438-2024-01230.

23.     Ms. Woolfolk received her Right to Sue Letter from the EEOC on May 22, 2025.

24.     Accordingly, she has exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407, which allows her to pursue relief in this Court.

## TOLLING AGREEMENT

25.     On June 11th, 2025, Ms. Woolfolk and Defendant Liberty entered into a Tolling Agreement with an effective date of June 6th, 2025.

26.     The Tolling Agreement included a tolling period of the statute of limitations for all of Ms. Woolfolk's legal claims from the effective date, June 6th, 2025, to August 1st, 2025, for a total of 56 days.

## FACTUAL ALLEGATIONS

**A.  Ms. Woolfolk's Background and Employment History at Liberty University**

27.     Ms. Woolfolk began her employment with Liberty University in April 2014 as Associate Producer/Assistant Director for Liberty Flames Sports Network, where she worked until July 2018. She is a 2005 graduate of Liberty University with a degree in communications and received her Master of Arts in Executive Leadership from Liberty University in 2022. Ms. Woolfolk enrolled in Liberty University's doctoral program (Educational Specialist degree) in Fall 2023 and was pursuing this degree at the time of her termination on June 26, 2024.

28.     In July 2018, Ms. Woolfolk transferred to Liberty University's Office of Equity and Compliance/Title IX ("OEC/Title IX Office") as a Civil Rights Investigator. At the time of her transfer, Ms. Woolfolk was the only Black employee in the Office of Equity and Compliance. She remained the only Black woman in that Office throughout her tenure at Liberty University.

**B.  Compensation Disparities and Financial Discrimination**

29.     Ms. Woolfolk's starting salary in July 2018 was $60,000, which increased to $65,000 in February 2022 (based upon performance recognized by former Title IX Coordinator Nathan Hopkins) and $68,000 in October 2022 (based upon Ms. Reich's increase in the pay of Investigators across the board).

30.     Despite Ms. Woolfolk's extensive experience and seniority, Liberty undervalued her compensation while paying less qualified white employees significantly more. David Sparnroft ("Mr. Sparnroft") was hired at approximately $74,000. Joel Nelson ("Mr. Nelson") and Mr. Sparnroft received raises from then-Title IX Coordinator Nathan Friesema, despite being less senior and frequently seeking guidance from Ms. Woolfolk.

31.     Ms. Reich gave Brittany Hall ("Ms. Hall") and Mr. Sparnroft the same salary Ms. Woolfolk was making despite their lack of experience compared to Ms. Woolfolk's extensive background as a Title IX Investigator. This compensation structure systematically undervalued Ms. Woolfolk's contributions while overcompensating less qualified white employees.

C.  **Ms. Woolfolk Faced Discriminatory Treatment and Hostile Work Environment**

32.    Throughout her employment in the Office of Equity and Compliance, Ms. Woolfolk was subjected to racially discriminatory treatment by her supervisors, Nathan Friesema ("Mr. Friesema"), Executive Director of Title IX and Title IX Coordinator, and Defendant Ashley Ann Reich, Senior Vice President of University Compliance.




33.     Mr. Friesema made racially charged comments, stereotyping Blacks as either "black-black" or "white-black," implying more positive connotations associated with the "white-black" characterization and creating a hostile work environment for Ms. Woolfolk as the only Black employee in the office.

34.     In May 2023, during a Microsoft Teams chat where colleagues were suggesting names for co-worker Brittany Hall's new dog, Mr. Sparnroft, Mr. Nelson, and Mr. Friesema suggested Confederate generals' names including "Stonewallia Jackson" and "Roberta E Lee" in Ms. Woolfolk's presence. Mr. Friesema, as supervisor, failed to stop this racially insensitive behavior and actively participated in it.

35.     Ms. Reich treated Ms. Woolfolk differently from white employees, either avoiding her entirely or interacting with her in a "patronizing and condescending" manner. While Ms. Reich would visit other employees' offices to chat and build relationships, she deliberately avoided Ms. Woolfolk's office, creating observable social isolation based on race.

36.     Similarly, Ms. Reich treated Ms. Woolfolk differently when it came to encouraging investigators to take advantage of continuing education benefits. When Ms. Reich approved other investigators' continuing education, she expressed enthusiastic congratulations and encouraged the investigator's academic pursuits.

37.     In contrast, on or about December 11, 2023, when approving Ms. Woolfolk's continuing education, Ms. Reich was much more neutral and lacking emotion and encouragement.

38.     When Ms. Woolfolk raised compliance concerns or workplace suggestions, she received "harsh or dismissive" responses from Ms. Reich and/or Mr. Friesma, while other employees received positive reception. The office culture became "split in half" where employees who questioned leadership, including Ms. Woolfolk, were ostracized, passed over for opportunities, and had their reputations negatively affected.

### D.  Disparate Treatment in Work Assignments and Expectations

39.     Ms. Woolfolk was consistently assigned tougher cases and a heavier workload than her white colleagues. She was given "the bigger dumpster fire, high profile cases" creating an

uneven distribution of work responsibilities that placed disproportionate burdens on her compared to similarly situated white investigators. To make matters worse, she was not offered additional resources or support.

40.    Mr. Friesema told Ms. Woolfolk he assigned her the tougher cases because he "knew she could handle the workload."

41.    Upon information and belief, Ms. Woolfolk's disproportionate workload contributed to her being excluded from consideration for serving on a Title IX Task Force.

42.    Despite maintaining the heaviest caseload compared to her coworkers, Ms. Woolfolk was still expected to participate in every call or meeting, unscheduled training, interview and onboard new hires, as well as be a resource to the entire team, despite the need to meet deadlines and the resulting criticisms from Mr. Friesma of Ms. Woolfolk's ability to move cases along.

43.    On occasion, Ms. Woolfolk was forced to work past 11:30 p.m. and past 1:00 a.m. on at least two occasions because of her workload, yet she was then penalized by Mr. Friesma for working late.

44.    Mr. Friesema and Ms. Reich explicitly directed other investigators to seek Ms. Woolfolk's assistance on their cases, reports, outcome letters, policy interpretations, and drafting, effectively making her an unpaid supervisor while maintaining her own full caseload.

45.    In or about December 2022, Ms. Woolfolk was expected to onboard and train Ms. Marissa Okes ("Ms. Okes") while also managing multiple formal investigations. Ms. Woolfolk's caseload, plus the burden of training Ms. Okes, prevented her from keeping an appropriate timeline for certain of her cases.

46.    Ms. Woolfolk, to no fault of her own, always was assigned complex Title IX cases through the holidays, summer break, etc. and always ends up having to work during any scheduled time off," while white colleagues were afforded more manageable schedules and were able to take time off without work interruptions. This pattern forced Ms. Woolfolk to work during Christmas vacation in December 2022 due to case timeline pressures.

47.     Several members of the investigator team expressed concern and frustration to Ms. Reich on Ms. Woolfolk's behalf. Because Ms. Woolfolk feared retaliation, as was a common fear within the OEC/Title IX Office, she worked through her vacation and still had to use vacation days, stating to her peers that she felt she did not have a choice.

48.     In addition, Mr. Friesema demonstrated clear favoritism towards white colleagues, particularly Mr. Sparnroft, with whom he maintained a close personal relationship that excluded Ms. Woolfolk from professional networking opportunities. Mr. Friesema  frequently socialized in the offices of Allie Stoudnour ("Ms. Stoudnour"), Ms. Hall, Mr. Sparnroft, and Ms. Okes, and witnesses observed that Mr. Friesema and Mr. Sparnroft would go hunting together, have lunch together and hang out together, creating an informal network of professional advancement that systematically excluded Ms. Woolfolk as the only Black employee.

49.     While Ms. Woolfolk was assigned the most difficult and time-consuming cases, her white colleagues had sufficient free time to socialize extensively inside the office and leave the office for extended lunches, shopping trips, and workout sessions, sometimes being gone for nearly two hours during the workday, demonstrating the contrast between Ms. Woolfolk's demanding schedule and the leisure time available to her white co-workers.

50.     In or about December 2023, there were multiple days in which Ms. Woolfolk observed her colleagues socializing and goofing off in the common areas of the office. Ms. Woolfolk expressed her concerns to co-workers as she was trying to get her work completed in the face of loud distraction throughout the office.

51.     On or about March 14, 2024, Ms. Woolfolk was pressured to stay late in the office because Mr. Friesema was micromanaging her investigation. She was preparing DropBox links to send to the participants, and Mr. Friesema repeatedly asked her for updates. Ms. Woolfolk left the office at approximately 10:00 p.m. that night.

52.     Sometimes, Ms. Reich would superficially thank Ms. Woolfolk for her contributions while simultaneously criticizing her for prioritizing case work, the primary

responsibility of her role, over additional tasks outside her job description that did not require her direct involvement.

### E.  Ms. Woolfolk Was Regularly Denied Opportunities for Career Advancement

53.    In or about August 2022, Ms. Woolfolk was interviewed by the U.S. Department of Education. Ms. Woolfolk's cooperation with federal investigators provided critical information that contributed to the Department of Education's findings of systemic compliance failures at Liberty University. Her detailed and honest reporting of Title IX violations helped establish the factual basis for the federal investigation that would ultimately result in a $14 million fine against Liberty in March 2024.

54.    In October 2022, Liberty created a Task Force to address Department of Education compliance issues. Despite Ms. Woolfolk being the most experienced investigator, Liberty selected Mr. Nelson, a white male with minimal experience whose cases were frequently described by colleagues as "dumpster fires." The selection process was conducted secretly while Mr. Nelson was attending a conference in Florida, where he was instructed to return immediately to join the Task Force.

55.    When Ms. Woolfolk met with Ms. Reich in November 2022 to express concerns about Mr. Nelson's limited capabilities and knowledge of Title IX, Ms. Reich responded by adding another white investigator, Ms. Sarah Mahle, to supplement Mr. Nelson rather than replace him with the more qualified Ms. Woolfolk.

56.    Upon information and belief, Ms. Woolfolk was not considered for the role because of her participation in the Department of Education Title IX investigation and her race. The decision to deny Ms. Woolfolk this high visibility assignment demonstrated Liberty's pattern of excluding Ms. Woolfolk from advancement opportunities while accommodating underperforming white employees.

57.    It was also around this time on November 20, 2022, that Ms. Reich further created a brand-new position for Ms. Mahle as "Director of Education," which was a supervisory role with a new title and more pay.  Ms. Woolfolk was not even considered for that position.

58.    In addition to expressing concerns about Mr. Nelson in November 2022, Ms. Woolfolk also expressed interest to Ms. Reich in the Deputy Title IX Coordinator position and requested to see the job description. She was told that Mr. Nelson was drafting the job description, which Ms. Woolfolk questioned as a conflict of interest given his inferior qualifications, experience, and relationship to other investigators.

59.    On or about November 14, 2023, Ms. Reich sent an email to the team with the job description for the Deputy Title IX Coordinator for Investigations position.

60.    Upon receipt of the job description, Elizabeth Ingram (also known as Elizabeth Halgren during her time at Liberty) ("Ms. Ingram"), an investigator, raised concerns about the qualifications section, stating she was "concerned about the qualifications and credentials section of this job description as it states only a bachelor's degree is required" and that "for a supervisory role, I would have expected a more robust qualifications and credentials section." Most investigators in the office had a master's degree.

61.    Ms. Reich responded that "the preferred qualifications are missing from the PDF but would definitely note a master's degree, JD, or something similar" and that HR would approve a final job description with preferred qualifications. However, on information and belief, these qualifications were deliberately altered to accommodate Mr. Sparnroft's lack of a master's degree and consideration for the position.

62.    Ms. Woolfolk applied for the Deputy Coordinator of Investigations position after many of her peers encouraged her given her extensive experience and qualifications. Many believed she was much more qualified than Mr. Sparnroft.

63.    Ms. Woolfolk interviewed for the position on or about January 5, 2024, with Mr. Friesema and Ms. Reich and felt the interview went well. During the interview process, Ms. Woolfolk learned, to her surprise, that the role had already been offered to Mr. Sparnroft, a white male colleague, before the position was even advertised to the rest of the team.

64.    Upon information and belief, Ms. Reich and Mr. Friesema had approached Mr. Sparnroft directly and told him to apply for the position, with the position being offered to him as

early as October 2023, long before other team members were made aware of the opportunity. Mr. Sparnroft was made "promises" about receiving the Deputy Coordinator role before the selection process was complete. This pre-determined selection process excluded Ms. Woolfolk from fair consideration despite her vastly superior qualifications and extensive experience, including almost six years as an investigator with 19 formal investigations and 4 live hearings completed, both a master's degree and progress towards a doctoral degree, compared to Mr. Sparnroft's significantly less experience and qualifications.

65.    After Mr. Sparnroft was offered the position, he shared that he had gotten the position and talked about all of the "behind the door conversations" he had with Mr. Friesema and Ms. Reich to be selected.

66.    When Mr. Sparnroft was subsequently terminated for sexual misconduct before taking the Deputy Coordinator position, Liberty had an opportunity to reconsider Ms. Woolfolk's superior qualifications. Instead, the role was given to Ms. Kasey Smith ("Ms. Smith"), a white female with no prior Title IX investigation experience and only eight months with the Title IX Office as an intake specialist. Ms. Smith had never written an investigative report or conducted a formal Title IX investigation, making her objectively less qualified than Ms. Woolfolk, who had nearly six years of experience and had completed 19 formal investigations. Ms. Smith was later promoted to Title IX Coordinator – again, despite her lack of experience as an investigator.

67.    Ms. Woolfolk was never informed that she was not selected for the Deputy Coordinator position, demonstrating the lack of respect and professional courtesy afforded to her by Liberty University's management.

**F.  Remote Work Policy Discrimination**

68.    Within the OEC/Title IX Office, it was common practice for employees to request remote work accommodations. On occasion, Ms. Woolfolk requested to work remotely, but her requests were denied despite legitimate business and medical justifications.  In comparison, her white colleagues were routinely permitted to work from home for far less compelling reasons.

69.    On or about June 22, 2023, Ms. Woolfolk requested to work from home to complete eleven reports due to loud office distractions but was denied by Ms. Reich, despite the legitimate business need for a distraction-free environment.

70.    On that day, with Ms. Reich not in the office and Mr. Friesema on vacation, the following occurred: (1) Mr. Sparnroft and other employees were engaging in a soccer match outside of Ms. Woolfolk's closed door, (2) Mr. Nelson and Mr. Sparnroft had a "dance party" in the lobby that was so loud that Ms. Woolfolk had to leave her office to see what was happening, and (3) Mr. Sparnroft started yelling loudly in Ms. Hall's office while twirling an umbrella. When Ms. Woolfolk emailed Ms. Reich requesting permission to work from home due to these impossible working conditions, she was asked why she could not just shut her door because Ms. Reich "heard" it was quiet in the office that day. Her door was already shut, but, because her office was in such a high-traffic area, the noise remained unbearable.

71.    In stark contrast, just two days earlier when another white investigator, Ms. Ingram, had car trouble and was waiting for an oven to be delivered to her home, Ms. Reich readily allowed her to work from home. Ms. Reich told Ms. Woolfolk that she "felt bad" for Ms. Ingram, demonstrating the sympathetic consideration afforded to white employees that was denied to Ms. Woolfolk, despite her more compelling business justification to work from home.

72.    Previously, the denial of Ms. Woolfolk's reasonable request to work remotely compared to her peers caused her significant emotional distress and anger. The disparate treatment she experienced in late 2022 was so severe that it directly contributed to a physical injury when her frustration over this disparate treatment led her to exercise with unusual intensity, during which she sustained an ankle injury that would subsequently require surgery.

73.    When Mr. Friesema attempted to dismiss Ms. Woolfolk's injury by attributing it to her age, she immediately corrected him, explaining how the hostile working conditions and discriminatory treatment were major contributing factors in causing her injury.

74.     The discriminatory pattern escalated when, in November 2023, Ms. Woolfolk requested to work remotely while recovering from the ankle surgery. Ms. Reich callously denied her request and informed her that she would have to take unpaid FMLA leave instead.

75.     The discriminatory nature of this policy became even more apparent when, shortly after denying Ms. Woolfolk's medical accommodation request, Ms. Reich sent an email to the team stating she would be working from home because "her kids had a preschool break." This blatant double standard demonstrated the arbitrary and racially discriminatory application of remote work policies.

76.     Ms. Reich routinely worked from home for childcare needs, frequently stating "Peter is traveling out of town and we do not have care for Theo" in direct contradiction to Liberty's remote work policy which explicitly required that employees working from home have alternative childcare arrangements available, prohibiting the use of remote work as a solution to childcare gaps. This blatant violation of Liberty's policy demonstrated a pattern of self-serving rule application while simultaneously denying Ms. Woolfolk's legitimate requests for remote work accommodations.

77.     Despite her own frequent remote work, Ms. Reich also questioned whether Ms. Woolfolk was physically in the office during team meetings, despite common knowledge that Ms. Woolfolk was routinely in the office, constantly working outside office hours, and rarely taking breaks. For example, on or about December 13, 2022, Ms. Reich joined a team meeting remotely, then questioned whether Ms. Woolfolk was physically in the office—an unnecessary call-out intended to intimidate and embarrass Ms. Woolfolk.

78.     It was not until her father was near death in the hospital in May and June 2024 that Ms. Woolfolk was granted the same flexibility to work remotely as her peers.

79.     In addition, white employees who were able to work remotely frequently abused the privilege with no consequence. On or about June 5, 2024, Ms. Woolfolk learned from Ms.

Ingram that Ms. Smith had been approved to work remotely but was seen working another job as a school resource officer in Appomattox at the end of May/early June 2024.

### G. Ms. Woolfolk Received a Performance Evaluation Which Improperly Characterized Her Performance

80.     Ms. Woolfolk is an experienced Civil Rights Investigator. Over the course of her six years in the OEC/Title IX office, she completed 19 formal investigations, 4 live hearings, and approximately 980 total incident reports.

81.     Dating back to the start of her employment, Ms. Woolfolk consistently received exemplary performance evaluations during her tenure at Liberty. In early 2022, previous Title IX Coordinator, Nate Hopkins, zealously advocated for Ms. Woolfolk to receive a raise because of her performance, stating that she was a better interviewer than both himself and the then-Deputy Coordinator, Stephany Steger. However, when Mr. Friesema and Ms. Reich took over the OEC/Title IX Office, Ms. Woolfolk was suddenly held to a much higher standard than her peers.

82.     On or about January 23, 2024, Ms. Woolfolk received her annual performance evaluation completed by Mr. Friesema. She received an overall rating of 3.00 out of 5, with specific ratings of 4 (exceeds expectations) in Work Quality and Leadership. However, she was marked as "needs improvement" in Workload Management (2) and Teamwork/Workplace Compatibility (2). This evaluation was days after she interviewed for the Deputy Coordinator promotion. It was clear to Ms. Woolfolk that the evaluation was an apparent attempt to create a record to deny her the promotion.

83.     Ms. Woolfolk disputed the evaluation and provided a written rebuttal on or about February 1, 2024, challenging the unfair ratings and documenting her concerns about the discriminatory treatment she was receiving.

84.     The evaluation contradicted both Mr. Friesema's and Ms. Reich's own previous acknowledgments of Ms. Woolfolk's heavy caseload and their statements that they assigned her more complicated cases because they knew she could handle them. The poor ratings in "Workload

Management" were directly attributable to the disproportionate and excessive workload Liberty had systematically imposed upon her.

85.    Mr. Friesema further wrote in the evaluation: "Workplace conflict, drama, and departmental infighting only hinders the work we're doing and the services we're providing and can lead to feelings of disdain and dissatisfaction with others and our jobs. Please make sure you are managing workplace conflict, drama, and similar issues in a respectful and professional manner when issues arise."

86.    Not only was this language used to characterize Ms. Woolfolk's legitimate complaints about discriminatory treatment and Title IX compliance violations as problematic behavior, but Ms. Woolfolk was not personally involved in any workplace drama or conflicts. She routinely kept to herself and did her job.  While the OEC/Title IX Office experienced interpersonal tensions among various staff members, Ms. Woolfolk maintained a professional demeanor and focused on her work responsibilities.

87.    Upon information and belief, Mr. Friesema inappropriately grouped Ms. Woolfolk with other employees who were involved in workplace conflicts to fabricate a basis to deny her the Title IX Deputy Coordinator job, rather than any actual misconduct on her part.

88.    Ms. Woolfolk's performance review also stated she needed to improve on maintaining adherence to Liberty's required timeline for Title IX case processing and find ways to be productive during standard office hours, ignoring the fact that many of the delays in Ms. Woolfolk's cases were directly caused by Mr. Friesema's failure to complete his responsibilities as Title IX Coordinator and sign off on action items and reports, as well as the excessive workload imposed upon her.

89.    Further, Liberty falsely claimed that Ms. Woolfolk was evaluated twice, receiving 2.92 out of 5 in August 2023 and 3 out of 5 in January 2024, when in fact she was only evaluated once in January 2024. This misrepresentation was used to create a false narrative of declining

performance and lack of improvement to justify her termination.

90.     In stark contrast to Ms. Woolfolk's surprisingly poor review, white employees including Ms. Cantrell, Ms. Pittman, Hannah Athey ("Ms. Athey"), and Ms. Stoudnour expressed surprise at receiving high January/February 2024 evaluations, with these employees telling Ms. Woolfolk they were surprised by their positive reviews.

91.     On information and belief, many of these employees received raises based upon their surprisingly positive reviews.

**H.  Failure to Comply with Title IX Policy and Procedure**

92.     Under federal Title IX regulations, Liberty's complaint resolution process was required to be conducted by trained officials, serving impartially and without prejudgment of the facts at issue. However, Liberty systematically violated these requirements through the conduct of Ms. Reich and Mr. Friesema.

93.     Ms. Reich, who oversaw both Title IX and Clery Act compliance at Liberty, was not certified or trained in Title IX, yet she acted as if she had the authority to make unilateral decisions to expel or ban students from campus, and she regularly influenced case outcomes either directly or through Mr. Friesema.

94.     When investigators followed appropriate Title IX procedures, Ms. Reich and Mr. Friesema would question them and redirect their investigations. Even when presented with official policy, Ms. Reich told employees, including Ms. Woolfolk, that they did not understand what it meant or that it did not apply to the particular situation even when it most certainly did.

95.     In or about February 2024, Ms. Woolfolk discovered that her confidential case information was being improperly shared throughout the office, including with Ms. Mahle, as Director of Education, who was no longer an investigator. This disclosure posed significant risks of prejudice to complainants and respondents, as investigators often participated as adjudicators in cases they did not investigate.

96.     On or about February 8, 2024, Mr. Friesema assigned Ms. Woolfolk to a case involving a respondent she knew and had opinions about, creating clear bias. Despite Ms.

Woolfolk's concerns about this conflict of interest, Mr. Friesema disregarded her objections and assigned her the case anyway, threatening the respondent's rights. Notably, the respondent in that case was Black, leading Ms. Woolfolk to question whether racial considerations influenced Friesema's insistent assignment.

97.    Mr. Friesema routinely violated Title IX by pre-investigating cases and directing their outcomes, telling Civil Rights Investigators how cases should be determined. When Ms. Woolfolk took over Mr. Sparnroft's cases, many complainants and witnesses stated they had not been fully informed of their rights or the Title IX process— a bare minimum expectation under Title IX.  Ms. Woolfolk protested to Mr. Friesema that he must not pre-determine cases nor direct outcomes, as violative of Title IX investigations.

98.    Ms. Reich violated Title IX policy by sitting in on case update meetings between Ms. Woolfolk and Mr. Friesema, claiming she was there to "watch" Mr. Friesema. This inappropriate involvement by someone in a Vice President position threatened case confidentiality and privacy. Ms. Woolfolk found it challenging to speak openly about her cases with Ms. Reich present, especially given the fact that Ms. Woolfolk learned that Ms. Reich was sharing case information with others. It was not typical for anyone other than the Title IX Coordinator and the investigator to be present during these meetings. Many investigators found that Ms. Reich's in-depth involvement exceeded the scope of her role.

99.    On or about April 10, 2024, Ms. Reich and Mr. Friesema informed the team that Emma Moulder ("Ms. Moulder") would be starting and would be shadowing investigators during intakes and sitting in meetings. She would be given access to investigative reports and documents as well. Ms. Ingram and Ms. Woolfolk discussed this and expressed concerns about being watched, stating that Ms. Moulder should just be sent to investigator training. Ms. Woolfolk referenced an occasion when Ms. Smith sat in on her intake and then immediately ran to Mr. Sparnroft's office, likely to share with him what she had heard, again, another Title IX violation.

100.    Mr. Friesema demonstrated insensitivity to trauma victims by interrupting Ms. Woolfolk during a sexual assault intake interview, knocking on the door and telling her to "wrap

it up" while looking at his watch. He later criticized Ms. Woolfolk for not completing the sexual assault intake within 30 minutes, despite her explanation that she had "never rushed a complainant through an intake, especially one reporting sexual assault," showing his lack of understanding of trauma-informed practices.

101.    The violations Ms. Woolfolk reported to Liberty officials included non-existent prevention, awareness, training, and education programs for the campus community, lengthy timeframes and delays for investigations, respondent athletes receiving special treatment during investigations, HR and executive leadership influencing outcomes, a general effort to downplay sexual assaults while, at the same time, pushing to escalate more cases to formal investigations, deciding cases before investigations took place, noncompliance with the Violence Against Women Act ("VAWA"), and a general "lack of administrative capability" in every area of Title IX.

**I.    Ms. Woolfolk's Protected Activity and Cooperation with Federal Investigations**

102.    In or about August 2022, Ms. Woolfolk was interviewed by U.S. Department of Education investigators regarding Liberty University's alleged Title IX and Clery Act compliance failures. During this federal investigation, Ms. Woolfolk dutifully cooperated with investigators and provided detailed, accurate information about systemic violations of federal law by Liberty.

103.    Ms. Woolfolk's cooperation with federal investigators included reporting multiple serious Title IX compliance violations, including: non-existent prevention and education programs for the campus community; excessive investigation timeframes with cases remaining idle for over a year; preferential treatment for student athletes during investigations; improper influence by HR and executive leadership on case outcomes; systematic efforts to minimize and downplay sexual assault reports; and predetermined case outcomes before investigations were completed.

104.    Upon information and belief, Ms. Reich was aware of Ms. Woolfolk's participation in the DOE investigation.

105.    As a result of the information provided by Ms. Woolfolk and other Liberty emlpoyees interviewed by DOE, the DOE imposed a $14 million fine on Liberty University in March 2024 for Clery Act violations.

106.    Rob Ritz, Ms. Reich's superior, was aware of Ms. Woolfolk's participation in the Department of Education investigation into Liberty's Clery Act violations, placing Liberty's senior leadership on notice of her protected whistleblowing activities.

## J.    Additional Protected Activity and Internal Complaints

107.    On or about February 7, 2024, Ms. Woolfolk filed a formal complaint with the U.S. Department of Education Office for Civil Rights (Case No. 11-24-2174) alleging race, age, and sex discrimination and retaliation by Liberty University, creating an official record of the systematic discriminatory treatment she had endured throughout her employment.

108.    On or about May 7, 2024, Ms. Woolfolk continued her efforts to ensure accountability at the highest levels of Liberty's administration by emailing Donald Tantum at the Department of Education, specifically stating that "President Dondi Costin has knowledge of Ashley Reich and Nathan Friesema's misconduct and noncompliance with Title IX regulations," thereby documenting the university's institutional awareness of ongoing violations.

109.    On or about May 17, 2024, Ms. Woolfolk met with an attorney from Gentry Locke who was investigating allegations of sexual harassment by Mr. Friesema. During this critical meeting, Ms. Woolfolk provided detailed testimony about multiple Title IX policy violations and expressed her serious concerns about the toxic power structure at Liberty, specifically noting that Mr. Friesema had characterized Ms. Reich as the "most powerful person at the University" and describing how the absence of proper checks and balances had created an environment where Ms. Reich and other employees could freely violate Title IX policy and federal law with impunity.

110.    On or about June 11, 2024, Ms. Woolfolk filed a formal internal complaint with Diane Padilla ("Ms. Padilla"), Liberty's Interim Title IX Coordinator, against Ms. Reich under Liberty's Discrimination, Harassment, and Equal Opportunity Policy, explicitly alleging discrimination based on "racism, ageism, or retaliation for cooperating with the Department of Education's recent investigation into the alleged Clery Act Violations for which the university was fined," thereby providing Liberty with unambiguous notice of Reich's discriminatory conduct and the university's legal exposure.

111.    In response to her complaint, Ms. Padilla offered Ms. Woolfolk the opportunity to work from home as a supportive measure, acknowledging the validity of her concerns and the need for protective intervention.

112.    Ms. Woolfolk's employment with Liberty University was abruptly terminated days later.

## K.  Retaliation and Wrongful Termination

113.    Over the course of Ms. Woolfolk's employment at Liberty, she focused on compliance and doing right by both her complainants and respondents, as was her duty as a Civil Rights Investigator. On numerous occasions, this required Ms. Woolfolk to challenge Ms. Reich and her power.

114.    Ms. Woolfolk constantly had to advise her supervisors, including Ms. Reich and Mr. Friesema, as to why they could or could not make certain decisions because of Title IX policy/procedure and/or legal violations.  Ms. Woolfolk continued to report and corroborate additional Title IX violations, which threatened the rights of students and employees at Liberty.

115.    Ms. Woolfolk continued to challenge Ms. Reich throughout 2022 and 2023 when Mr. Nelson was chosen for superior opportunities, such as the Task Force, despite his lack of experience and poor quality of work. It was a general consensus among Ms. Woolfolk and her peers that Ms. Reich was overstepping her oversight role and making decisions in Title IX cases that were reserved for the Title IX Coordinator, such as the emergency removal of a student.

116.    On or about June 26, 2024, just two weeks after filing her internal complaint against Ms. Reich and Liberty University, Ms. Woolfolk was terminated via Microsoft Teams call by Ms. Reich and Steve Foster, Executive Vice President of Human Resources. The stated reason for termination was vague "compliance issues," but no specific details were provided to Ms. Woolfolk about what these alleged compliance issues were, making it impossible for her to address or refute the allegations.

117.    Ms. Woolfolk's termination occurred on the same day as Investigators Peter Brake and Elizabeth Ingram, both of whom had also reported violations and cooperated with

investigations, suggesting a coordinated effort to eliminate employees who had engaged in protected whistleblowing activities. All three employees who were terminated on June 26, 2024, were mandated reporters who had collaborated on reporting Mr. Friesema's sexual misconduct and had filed Title IX complaints against Ms. Reich.

118.    On information and belief, following Ms. Woolfolk's termination from Liberty, Ms. Smith, who has significantly less experience than Ms. Woolfolk, was promoted to Title IX Coordinator. She received both a raise to $120,000.00 annual salary, a parking space, and benefits.

**FIRST CAUSE OF ACTION**
**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**42 USCS § 2000e et seq.**
**(Against Defendant Liberty University)**

119.    Plaintiff realleges and incorporates by reference the previous paragraphs 1-118 as if fully set forth herein.

120.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits employers from discriminating against employees because of their race, including in hiring, promotion, compensation, terms, conditions, and privileges of employment. *Schafer v. State Dep't of Health and Mental Hygiene*, 359 Fed. Appx. 385, 388 (4th Cir. 2009); 42 U.S.C.S. § 2000e-2(a).

121.    At all times relevant to this action, Liberty was Ms. Woolfolk's employer within the meaning of Title VII, employing more than fifteen (15) individuals and engaging in an industry affecting commerce.

122.    Ms. Woolfolk is a member of a protected class under Title VII as a Black woman.

123.    Throughout her employment with Liberty, Ms. Woolfolk was subjected to discriminatory treatment because of her race, including but not limited to: being subjected to racially offensive comments by Mr. Friesema characterizing African Americans as "black-black" or "white-black"; being assigned cases "specifically because the student was black"; being excluded from advancement opportunities in favor of less qualified white employees; being denied promotions and raises while less qualified white colleagues received them; being assigned

disproportionate workloads compared to white colleagues; being denied remote work privileges afforded to white employees; and receiving discriminatory performance evaluations.

124.    When she was told she was assigned the tougher cases because Mr. Friesema "knew she could handle it," this exemplified the discriminatory "strong black woman" stereotype—a harmful myth rooted in slavery-era beliefs that Black women are inherently more capable of enduring hardship and require less support than others.

125.    Ms. Woolfolk was qualified for the positions she held and the promotions she sought, including the Deputy Title IX Coordinator position for which she was passed over in favor of less qualified white candidates.

126.    Liberty's discriminatory conduct was intentional and created disparate treatment based on Ms. Woolfolk's race, as evidenced by the differential treatment she received compared to similarly situated white employees.

127.    Liberty's proffered reasons for its adverse employment actions against Ms. Woolfolk, including denial of promotions and ultimate termination, are pretextual and were motivated by racial discrimination.

128.    As a direct and proximate result of Liberty's unlawful race discrimination in violation of Title VII, Ms. Woolfolk has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

129.    As a direct and proximate result of Liberty's unlawful race discrimination, Ms. Woolfolk has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

130.    Liberty explicitly tolerated a culture of racially-charged commentary and harassment and ratified such conduct by awarding promotions and career-advancing opportunities to those engaged in such harassment. As such, Liberty's unlawful discriminatory conduct was

willful, wanton, and malicious, and was done with conscious disregard of Ms. Woolfolk's civil rights, entitling her to an award of punitive damages.

131.    Ms. Woolfolk also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

132.    Ms. Woolfolk seeks injunctive relief to prevent Liberty University from engaging in future race-based discrimination and disparate treatment against minority employees. Such injunctive relief should include, but not be limited to, requiring Liberty University to implement and maintain non-discriminatory hiring, promotion, compensation, and termination policies, providing mandatory training on federal civil rights laws and unconscious bias for all supervisory personnel, establishing clear procedures for reporting and investigating discrimination complaints, and ensuring equal treatment of all employees regardless of race in work assignments, advancement opportunities, and workplace accommodations. This injunctive relief is necessary to prevent the continuation of the systematic discriminatory practices that Ms. Woolfolk has endured and to ensure compliance with federal civil rights laws.

<u>**SECOND CAUSE OF ACTION**</u>
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**42 USCS § 2000e et seq.**
**(Against Defendant Liberty University)**

133.    Plaintiff realleges and incorporates by reference the previous paragraphs 1-118 as if fully set forth herein.

134.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, prohibits employers from retaliating against employees who oppose discriminatory practices or participate in investigations, proceedings, or hearings under Title VII.

135.    Ms. Woolfolk engaged in protected activity under Title VII by: filing a complaint with the U.S. Department of Education Office for Civil Rights alleging race, age, and sex discrimination in February 2024; filing an internal complaint against Ms. Reich alleging discrimination based on racism, ageism, and retaliation in June 2024; and opposing discriminatory practices throughout her employment.

136. Liberty University, through Mr. Friesema and Ms. Reich, had knowledge of Ms. Woolfolk's protected activities, including her cooperation with federal investigations and her complaints about discriminatory treatment.

137. Following Ms. Woolfolk's protected activity, Liberty subjected her to adverse employment actions, including but not limited to: receiving poor performance evaluations that contradicted her actual work performance; being denied promotions and advancement opportunities; receiving disparate treatment in work assignments and policies; and ultimately being terminated on June 26, 2024, just two weeks after filing her internal complaint.

138. There was a causal connection between Ms. Woolfolk's protected activity and the adverse employment actions taken against her, as evidenced by the timing of her termination immediately following her internal complaint and the pattern of retaliation against other employees who cooperated with EEO and DOE investigations.

139. The atmosphere of retaliation at Liberty was so pervasive that multiple employees feared reporting misconduct or cooperating with investigations. As early as Fall 2022, many employees refused to sign a complaint made by former Title IX Coordinator Ian McRary due to fears of retaliation, with one employee stating, "They will find a way to fire me." This climate of fear was so widespread that employees who remained at Liberty kept quiet, demonstrating how Liberty's retaliatory practices chilled the exercise of civil rights by its workforce.

140. Liberty's proffered reasons for the adverse employment actions, including the vague "compliance issues" cited for Ms. Woolfolk's termination, are pretextual and were motivated by retaliation for her protected activity.

141. As a direct and proximate result of Liberty's unlawful retaliation in violation of Title VII, Ms. Woolfolk has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

142. As a direct and proximate result of Liberty's unlawful retaliation, Ms. Woolfolk has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, severe mental anguish and emotional distress, including PTSD,

depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

143.    Liberty orchestrated Ms. Woolfolk's termination just two weeks after she filed a complaint about Ms. Reich and further engaged in a coordinated effort to silence whistleblowers when it terminated Mr. Brake and Ms. Ingram on the same day. Thus, Liberty University's unlawful retaliatory conduct was willful, wanton, and malicious, and was done with conscious disregard of Ms. Woolfolk's civil rights, entitling her to an award of punitive damages.

144.    Ms. Woolfolk also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

145.    Ms. Woolfolk seeks injunctive relief to prevent Liberty University from engaging in future race-based retaliation against employees who oppose discrimination or participate in civil rights investigations, including but not limited to implementing policies and procedures to ensure equal treatment of employees regardless of race and prohibiting retaliation against employees who report discrimination or cooperate with federal investigations.

### THIRD CAUSE OF ACTION
### Race Discrimination in Violation of 42 U.S.C. § 1981
### (Against All Defendants)

146.    Plaintiff realleges and incorporates by reference the previous paragraphs 1-118 as if fully set forth herein.

147.    This claim arises under 42 U.S.C. § 1981, which protects the rights of all individuals to be free from race-based discrimination in contractual relationships. It also applies to the employment relationship, including that which existed between Plaintiff and Defendant Liberty University at all relevant times.

148.    Ms. Woolfolk is a member of a protected class under Section 1981 as a Black woman.

149.    Throughout her employment with Liberty University, Ms. Woolfolk carried out her investigator responsibilities, duties, and tasks with professionalism and competence.

150.    Ms. Woolfolk was subjected to race-based discrimination by all Defendants, including but not limited to: Mr. Friesema making racially offensive comments characterizing Blacks as "black-black" or "white-black"; being present during conversations suggesting Confederate generals' names without consideration for her presence as a Black woman; being assigned cases based on racial considerations; being denied promotions in favor of less qualified white candidates; receiving disparate treatment in compensation, work assignments, and workplace policies; and ultimately being terminated in retaliation for opposing discriminatory practices.

151.    When she was told she was assigned the tougher cases because Mr. Friesema "knew she could handle it," this exemplified the discriminatory "strong black woman" stereotype—a harmful myth rooted in slavery-era beliefs that Black women are inherently more capable of enduring hardship and require less support than others.

152.    Section 1981 also authorizes individual liability. *Carson v. Giant Food, Inc.*, 187 F.Supp.2d 462, 483 (D. Md.) (Motz, J.), citing *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1145 (4th Cir. 1975); *see also Shirkey v. Eastwind Cmty. Dev. Corp.*, 941 F. Supp. 567, 572 (D. Md. 1996), *modified on other grounds*, 993 F. Supp. 370 (D. Md. 1998).

153.    Ms. Reich specifically engaged in racially discriminatory conduct by: denying Ms. Woolfolk advancement opportunities while promoting less qualified white employees; maintaining discriminatory policies regarding remote work that disproportionately affected Ms. Woolfolk; and ultimately deciding to terminate Ms. Woolfolk's employment in retaliation for her complaints about discrimination.

154.    Defendants' discriminatory conduct impaired Ms. Woolfolk's ability to make and enforce contracts on the same terms as white employees, in violation of Section 1981.

155.    The individual Defendant, Ms. Reich, can be held individually liable under Section 1981 for her intentional discrimination against Ms. Woolfolk.

156.    As a direct and proximate result of Defendants' unlawful race discrimination in violation of Section 1981, Ms. Woolfolk has suffered and continues to suffer monetary and economic damages, including but not limited to loss of future income, compensation, and benefits.

157.    As a direct and proximate result of Defendants' unlawful retaliatory conduct and violation of Section 1981, Plaintiff has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

158.    Liberty explicitly tolerated a culture of discriminatory conduct by awarding promotions and career-advancing opportunities to those who did not challenge common practice at Liberty. As such, Liberty's unlawful discriminatory conduct was willful, wanton, and malicious, as well as demonstrated reckless indifference to Ms. Woolfolk's civil rights, entitling her to an award of punitive damages.

159.    In her individual capacity, Ms. Reich engaged in willful, malicious, and conscious disregard of Ms. Woolfolk's civil rights when she systematically excluded Ms. Woolfolk from advancement opportunities, despite superior qualifications, maintained a discriminatory work environment, and made the decision to terminate Ms. Woolfolk. Thus, Ms. Woolfolk is entitled to an award of punitive damages.

160.    Ms. Woolfolk also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of 42 U.S.C. § 1981
### (Against All Defendants)

161.    Plaintiff realleges and incorporates by reference the previous paragraphs 1-118 as if fully set forth herein.

162.    42 U.S.C. § 1981 prohibits retaliation against individuals who oppose race discrimination or assert their rights under the statute.

163.    Ms. Woolfolk engaged in protected activity under Section 1981 by opposing race discrimination throughout her employment, including: filing complaints with the Department of Education and EEOC alleging race discrimination; filing internal complaints about discriminatory treatment; and opposing racially discriminatory practices by Liberty officials.

164.    Upon information and belief, all Defendants had knowledge of Ms. Woolfolk's protected activity and her opposition to race discrimination, including her cooperation with federal investigations and her formal complaints about discriminatory treatment.

165.    Following Ms. Woolfolk's protected activity, Defendants subjected her to adverse employment actions, including but not limited to: receiving discriminatory performance evaluations; being denied promotions and advancement opportunities; receiving disparate treatment in work assignments and workplace policies; and ultimately being terminated on June 26, 2024.

166.    There was a causal connection between Ms. Woolfolk's protected activity under Section 1981 and the adverse employment actions taken against her, as evidenced by the timing of the retaliation and the pattern of adverse treatment following her complaints about race discrimination.

167.    Ms. Reich, acting in her individual capacity, intentionally retaliated against Ms. Woolfolk for her opposition to race discrimination, including by making the decision to terminate her employment shortly after she filed internal complaints about racial discrimination.

168.    Ms. Reich did not treat similarly situated investigators in the Office of Equity and Compliance in the same manner.

32

169.    As a direct and proximate result of Defendants' unlawful retaliation in violation of Section 1981, Ms. Woolfolk has suffered and continues to suffer monetary and economic damages, including but not limited to loss of future income, compensation, and benefits.

170.    As a direct and proximate result of Defendant's unlawful retaliatory conduct and violation of Section 1981, Plaintiff has suffered and continues to suffer damages for loss of future earning capacity, damage to her professional reputation, and severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

171.    Liberty explicitly tolerated a culture of retaliatory conduct by awarding promotions and career-advancing opportunities to those who did not challenge common practice at Liberty. As such, Liberty's unlawful discriminatory conduct was willful, wanton, and malicious Further, Liberty's calculated decision to terminate three individuals who reported misconduct at the same time demonstrated reckless indifference to Ms. Woolfolk's civil rights, entitling her to an award of punitive damages.

172.    In her individual capacity, Ms. Reich engaged in willful, malicious, and conscious disregard of Ms. Woolfolk's civil rights when she systematically excluded Ms. Woolfolk from advancement opportunities, despite superior qualifications, maintained a retaliatory, hostile work environment, and made the decision to terminate Ms. Woolfolk. Thus, Ms. Woolfolk is entitled to an award of punitive damages against Defendant Reich.

173.    Ms. Woolfolk also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

### FIFTH CAUSE OF ACTION
**Retaliation in Violation of Title IX of the Education Amendments of 1972**
**20 U.S.C. § 1681 *et seq.***
**(Against Defendant Liberty University)**

174.    Plaintiff realleges and incorporates by reference the previous paragraphs 1-118 as if fully set forth herein.

175.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, prohibits sex discrimination in education programs and activities that receive federal financial assistance.

176.    "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination prohibited under Title IX." *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 584 (D. Md. 2021) (quoting *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 173 (2005).

177.    Liberty University is subject to Title IX as it operates educational programs and activities that receive federal financial assistance from the U.S. Department of Education.

178.    Ms. Woolfolk engaged in protected activity under Title IX by, among other ways: cooperating with the Department of Education investigation into Liberty University's Title IX compliance violations; reporting Title IX violations including improper case management, influence by unauthorized personnel, and failure to maintain proper procedures; filing complaints about Title IX compliance failures; performing her duties as a Title IX investigator in accordance with federal requirements; and Clery Act violations.

179.    Ms. Woolfolk's reports to federal investigators included specific Title IX violations such as: lengthy timeframes for investigations with cases sitting idle for over a year; student athletes receiving special treatment during investigations; HR and executive leadership improperly influencing case outcomes; deciding cases before investigations were complete; and Ashley Reich overstepping her oversight role and making decisions reserved for the Title IX Coordinator.

180.    Upon information and belief, Liberty had knowledge of Ms. Woolfolk's protected activity under Title IX, including her cooperation with federal investigations and her reports of Title IX compliance violations.

181.    Following Ms. Woolfolk's protected activity under Title IX, Liberty subjected her to adverse employment actions, including but not limited to: discriminatory performance evaluations; denial of advancement opportunities; disparate treatment in work assignments and policies; and ultimately termination on June 26, 2024.

182.    The timing and circumstances of Ms. Woolfolk's termination, occurring shortly after her reports of Title IX violations and cooperation with federal investigations, establish a causal connection between her protected activity and the adverse employment action.

183.    The atmosphere of retaliation at Liberty was so pervasive that multiple employees feared reporting misconduct or cooperating with investigations. As early as Fall 2022, many employees refused to sign a complaint made by former Title IX Coordinator Ian McRary due to fears of retaliation, with one employee stating "They will find a way to fire me." This climate of fear was so widespread that employees who remained at Liberty kept quiet, demonstrating how Liberty's retaliatory practices chilled the exercise of civil rights by its workforce.

184.    As a direct and proximate result of Liberty University's unlawful retaliation in violation of Title IX, Ms. Woolfolk has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past and future income, compensation, and benefits.

185.    As a direct and proximate result of Liberty University's unlawful retaliation, Plaintiff has suffered and continues to suffer damages for loss of future earning capacity, emotional distress and damage to her professional reputation.

186.    Ms. Woolfolk also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action.

187.    Ms. Woolfolk also seeks injunctive relief to prevent Liberty from continuing its retaliatory practices, including but not limited to: (a) enjoining Liberty University from engaging in further retaliation against employees based on protected activities; (b) requiring Liberty University to implement comprehensive anti-retaliation policies and training programs; (c) requiring Liberty University to implement appropriate Title IX investigative policies and procedures which comply with federal mandate; (d) mandating regular monitoring and reporting of compliance with federal civil rights laws; and (e) ordering Liberty University to take all necessary steps to ensure a workplace free from retaliation.

## SIXTH CAUSE OF ACTION
**Retaliation in Violation of the Virginia Whistleblower Protection Law
Va. Code Ann. § 40.1-27.3
(Against Defendant Liberty University)**

188.    Plaintiff realleges and incorporates by reference the previous paragraphs 1-118 as if fully set forth herein.

189.    The Virginia Whistleblower Protection Law, Virginia Code § 40.1-27.3, prohibits employers from retaliating against employees who report violations of federal or state law or regulation.

190.    Ms. Woolfolk engaged in protected activity under the Virginia Whistleblower Protection Law by reporting violations of federal law, including Title IX violations, Title VII violations, and Clery Act violations to appropriate authorities, including federal investigators and university officials.

191.    Ms. Woolfolk's reports concerned violations of federal law and regulation, including but not limited to: improper Title IX case management and procedures; discrimination based on race and sex in violation of federal civil rights laws; failure to comply with Clery Act requirements; and other violations of federal education and civil rights statutes.

192.    Upon information and belief, Liberty had knowledge of Ms. Woolfolk's protected whistleblowing activity, including but not limited to her cooperation with Department of Education investigations and her reports of federal law violations.

193.    Liberty retaliated against Ms. Woolfolk for her protected whistleblowing activity by subjecting her to adverse employment actions, including discriminatory treatment, denial of advancement opportunities, and ultimately termination on June 26, 2024.

194.    The proximity in time between Ms. Woolfolk's protected whistleblowing activity and her termination, combined with Liberty's known intent to retaliate against employees who cooperated with federal investigations, establishes causation under the Virginia Whistleblower Protection Law.

195.    As a direct and proximate result of Liberty's violation of the Virginia Whistleblower Protection Law, Ms. Woolfolk has suffered and continues to suffer monetary and economic damages, including but not limited to loss of past income, compensation, and benefits.

196.    Ms. Woolfolk also seeks reimbursement of attorneys' fees, interest, and costs associated with pursuing this civil action under the Virginia Whistleblower Protection Law.

197.    Ms. Woolfolk seeks injunctive relief to restrain Defendant Liberty University from engaging in future retaliation against employees who report violations of federal or state law in good faith, as protected under the Virginia Whistleblower Protection Law. Such injunctive relief is necessary to prevent ongoing harm to current and future employees who may seek to report legal violations and to ensure Liberty's compliance with its legal obligations to protect whistleblowers from retaliatory conduct.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare that Defendant Liberty University's conduct of committing race discrimination against Plaintiff Erika Woolfolk to be in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*;

B.    Declare that Defendant Liberty University's conduct of committing retaliation against Plaintiff Erika Woolfolk to be in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*;

C.    Declare that all Defendants' conduct of committing race discrimination against Plaintiff Erika Woolfolk to be in violation of 42 U.S.C. § 1981;

D.    Declare that all Defendants' conduct of committing retaliation against Plaintiff Erika Woolfolk to be in violation of 42 U.S.C. § 1981;

E.    Declare that Defendant Liberty University's conduct of committing retaliation against Plaintiff Erika Woolfolk to be in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*;

F.     Declare that Defendant Liberty University's conduct of retaliating against Plaintiff Erika Woolfolk to be in violation of the Virginia Whistleblower Protection Law, Virginia Code § 40.1-27.3;

G.     Enjoin all Defendants to comply with the aforementioned federal and state laws and to cease and desist from engaging in discriminatory and retaliatory conduct;

H.     Award to Plaintiff her economic damages against all Defendants, jointly and severally, including but not limited to back pay, front pay, lost wages, lost benefits, lost retirement contributions, lost tuition benefits, and other pecuniary losses in amounts to be proven at trial;

I.     Award to Plaintiff against all Defendants, jointly and severally, compensatory damages for emotional distress, mental anguish, pain and suffering, humiliation, embarrassment, damage to her professional reputation, PTSD, and other non-economic harm in amounts to be proven at trial;

J.     Award to Plaintiff punitive damages against Defendant Ashley Ann Reich in her individual capacity in an amount to be determined at trial;

K.     Award to Plaintiff punitive damages against Defendant Liberty University in amounts to be determined at trial to the extent permitted by law;

L.     Award to Plaintiff her reasonable attorneys' fees and costs incurred in this action pursuant to Title VII, 42 U.S.C. § 1981, Title IX, and the Virginia Whistleblower Protection Law;

M.     Award to Plaintiff pre-judgment and post-judgment interest as permitted by law;

N.     Order Defendant Liberty University to expunge from Plaintiff's personnel file any negative references related to her termination;

O.     Order Defendant Liberty University to implement and maintain policies and procedures to prevent discrimination, harassment, and retaliation in the workplace, including appropriate training for supervisors and managers; and

P.     Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff Erika Woolfolk requests a trial by jury on all claims and issues of fact set forth in this complaint.

Dated: August 11, 2025                    Respectfully submitted,


_/s/ Neil L. Henrichsen_
Neil L. Henrichsen, VSB No. 32360
HENRICHSEN LAW GROUP, PLLC
301 W. Bay Street, 14th Floor
Jacksonville, Florida 32202
Tel: (904) 381-8183
Fax: (904) 381 8191
Email: nhenrichsen@hslawyers.com
_Attorneys for Plaintiff_