CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

10/23/2026

LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

ERIKA WOOLFOLK,

*Plaintiff*,

v.

LIBERTY UNIVERSITY, ET AL.,

*Defendants*.

CASE NO. 6:25-CV-00059

**MEMORANDUM OPINION & ORDER**

Pending before the Court are Defendants' motion for summary judgment (Dkt. 33) and motion to exclude the expert testimony of Dr. Weiner (Dkt. 35). This Memorandum Opinion and Order memorializes what the Court already stated from the bench following oral argument on October 23, 2026—namely, Defendants' motion for summary judgment will be granted in part and denied in part and their *Daubert* motion will be granted.

**A. SUMMARY JUDGMENT**

Title VII and § 1981 prohibit race discrimination. *See* 42 U.S.C. §§ 1981 and 2000e–2(a)(1). The elements are the same for proving either claim. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016). A plaintiff may establish discrimination through either (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Here, Plaintiff relies on the *McDonnell Douglas* framework.

Race discrimination comes in many forms. In her Complaint, Plaintiff alleged that: (1) she was subjected to a racially hostile work environment; (2) she received more work than her white colleagues; (3) she received less favorable remote work benefits than similarly situated white employees; (4) she received lower pay than similarly situated white employees; (5) she was not promoted because of her race; and (6) she was retaliated against after engaging in protected activity. Dkt. 1. Liberty moved for summary judgment on each of these claims; however, it did not specifically argue that Plaintiff's disparate pay claim fails. Dkts. 33–34. In her opposition to summary judgment, Plaintiff disclaimed a hostile work environment claim; however, she argues that she has created jury issues on her unequal workload claim; her disparate remote work claim; her failure to promote claim; and her retaliation claims. The Court will discuss each of these theories, in turn.

**1. Disparate Treatment as to Workload**

The Court will begin with Plaintiff's claim that she was discriminated against because she received more work than her white colleagues. To establish a *prima facie* case of disparate treatment, a plaintiff must prove four elements: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). Plaintiff claims she received a heavier workload because she is African American. But, under normal circumstances, being given a heavier workload does not create an inference of racial discrimination; rather, it shows an employer's confidence in the employee's abilities. An employer expressing confidence in an employee's intellect and talents is something not traditionally associated with racial animus.

Regardless, being given a heavier workload is generally not an adverse employment action under Title VII or § 1981.[1] A disproportionately heavy workload can only be an adverse action, if it can be one at all, when "the additional work significantly changes the employee's responsibilities so as to *diminish* that worker's role or status, or *exposes the worker to dangerous or extreme conditions* not appropriate to her job classification." *Young v. Rogers & Wells LLP*, 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002). Here, Plaintiff's workload was squarely within her job classification, and if anything, accorded her more respect in the office than less respect.

Accordingly, summary judgment must be granted to Liberty on her disparate workload claim.

**2. <u>Disparate Treatment as to Remote Work</u>**

The Court will now turn to Plaintiff's claim that she was discriminated against because she was denied remote work opportunities. The disparate treatment standard for Plaintiff's remote work claim is the same as the standard for her "excessive work" claim. *See Cosby*, 93 F.4th at 714.

Like with her excessive work claim, Plaintiff has failed to come forward with sufficient evidence to create an inference of racial discrimination because she was denied remote work on two occasions. To begin with, Plaintiff concedes she was granted remote work on multiple

---

[1] *See Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 609 (11th Cir. June 17, 2008) (employee did not suffer adverse employment action when supervisor increased workload, assigned him additional tasks and denied him breaks while allowing employees outside of protected class to take breaks); *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) ("the mere fact that an employee ... had a heavier workload than her co-workers does not amount to an adverse employment action")); *Benningfield v. City of Houston*, 157 F.3d 369, 376–77 (5th Cir.1998) (holding that being assigned an unusually heavy work load is merely an administrative matter and not an adverse employment action); Brodetski v. Duffey, 141 F.Supp.2d 35, 45 (D.D.C.2001) (finding that plaintiff's heavier workload compared to his peers was not sufficiently adverse action, that "work inequity" is the "level of personnel decision-making in which courts should not meddle," and that employees should expect to shoulder an "extra load" on occasion or "step in if there [are] unexpected staff shortages").

occasions. Dkt. 41-1 at 14–15. However, she cherry-picks two examples when she was denied remote work and suggests that white colleagues were granted remote work under similar circumstances. Dkt. 41 at 10–11. But she has produced no evidence showing that white colleagues were *always* granted remote work or that white employees were granted remote work at higher rates than she was. With this factual vacuum, a reasonable factfinder could not find discriminatory motive, especially where Plaintiff could have been granted remote work at a higher rate than her white colleagues. It is simply impossible to infer racial animus by isolating select examples of decisions to grant or deny remote work.

Moreover, Plaintiff's requests were different in kind than the comparator requests she identifies. For example, her remote work request because of her ankle surgery was for a nearly two-month period. Dkt. 41 at 10–11. Plaintiff does not provide a single example of a white colleague being granted permission to work remotely for several weeks or months.

Finally, Title VII is not designed to convert courts into business managers. Courts (and juries) are ill-suited to decide when remote work is operationally permissible and when it is not. Employers are best suited to decide when to grant or deny remote work benefits and absent clear evidence of racial animus, courts should not second-guess those operational decisions. That is why denying remote work, like assigning an employee more work, is not generally an adverse employment action absent some indicia that the denial of remote work altered the employee's terms of employment or stigmatized them because of their race. *See*, *e.g.*, n.1.

Accordingly, Defendants' motion for summary judgment must be granted as to Plaintiff disparate benefits theory.

**3. <u>Failure to Promote</u>**

Liberty also moves for summary judgment on Plantiff's failure-to-promote theory. Dkt. 34 at 16. To establish a *prima facie* claim of a discriminatory failure to promote under Title VII, a plaintiff must show that: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004). Liberty claims it had legitimate requirements—like prior management experience—that excluded Plaintiff from being hired. Dkt. 34 at 16. Plaintiff asserts this is pretext because: (1) she was better qualified for the job than the white people who were selected, and (2) she amassed circumstantial evidence undermining the credibility of the employer's state reasons. Dkt. 41.

Plaintiff's evidence easily creates a jury issue on whether she was discriminated against when she was rejected for promotion. On two occasions, Liberty hired white individuals who had less education and less Title IX experience than Plaintiff. *E.g.*, Dkt. 41-1 at 8–9, 41 at ¶ 28. Based on the selected candidates' objectively inferior qualifications, a jury could infer those hiring decisions were based on racial animus. This is especially so when Liberty emphasized the importance of the selected candidates' law enforcement background and Title IX discourages a "criminal investigation" model and requires Title IX coordinators to maintain neutrality. *E.g.*, *Doe v. Colgate Univ.*, 2017 WL 4990629, at *11 (N.D.N.Y. Oct. 31, 2017), aff'd, 760 F. App'x 22 (2d Cir. 2019) (discussing the "qualitative difference" between a criminal investigation and a Title IX investigation).

An inference of discrimination is further bolstered by Plaintiff's evidence that Mr. Friesema, who was a decisionmaker on who would be hired or promoted, had a history of making

racial comments like some people are "Black-Black" while others are "White-Black," and calling Plaintiff the "token black person."

Because a jury could infer that Plaintiff was not promoted because of her race, Defendants' motion for summary judgment must be denied as to Plaintiff's failure-to-promote claim.

**4. <u>Retaliation claims under Title VII, § 1981, Title IX, and the Virginia Whistleblower Protection Act</u>**

To establish a *prima facie* case of retaliation under Title VII and § 1981, a plaintiff must show that (1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal connection existed between the two. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). Establishing causation at the *prima facie* stage "is not an onerous burden," and may be shown by facts suggesting the adverse action occurred because of the protected activity or by temporal proximity. *Id.* at 123, 127. The standards for Title IX retaliation and Virginia Whistleblower Protection Act retaliation are not materially different. *E.g.*, *Lewis v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 134 F.4th 286, 292 (5th Cir. 2025) (applying Title VII retaliation standard in a Title IX case because both statutes have similarly worded provisions and are afforded similar interpretation).

Plaintiff has produced evidence that she continuously engaged in protected activity between 2022 and 2024, including participating in a sweeping Title IX investigation and making an OCR complaint about her own treatment at Liberty. *See generally*, Dkt. 41-1. There is sufficient evidence showing that Liberty knew about some or all of this protected activity. *Id.* The question then is whether Liberty terminated Plaintiff because of this protected activity.

Because Plaintiff engaged in protected activity as late as June 2024 and was fired on June 26, 2024, a jury could infer causation from that temporal proximity. And Liberty's shifting reasons for firing Plaintiff do not match her otherwise good work record, which includes Liberty's own

theory that she was given more work because she was good at her job. Based on all of this, all of Plaintiff's retaliation theories survive Defendants' motion for summary judgment.

### B. DAUBERT MOTION

In addition to moving for summary judgment, Defendants move to exclude the opinions of Dr. Jennie Weiner—Plaintiff's proffered social science expert. Dkt. 35.

The Court will grant this motion because Dr. Weiner's opinions on race are inextricably intertwined with her opinions on gender.[2] For example, her report repeatedly suggests that Black men are treated more favorably than Black women, demonstrating that her opinions rely heavily on gender discrimination in conjunction with racial discrimination. While the Court recognizes the concept of intersectionality—*i.e.*, that different identities like race, sex, sexuality, class, and age can overlap—Title VII does not. Plaintiff did not raise gender discrimination claims or exhaust those claims before the EEOC. She cannot now backdoor a gender discrimination theory through expert testimony, which will only confuse the jury in the race discrimination case.

Additionally, the Court is unfamiliar with a single decision by the Fourth Circuit or another district court in this Circuit applying *Daubert* in the context of a "social framework" expert, which makes it more difficult to assess admissibility here.[3] But since the Court has dismissed Plaintiff's

---

[2] Dkt. 36-1 at 4 ("This report presents research focused on racial and gender stereotypes and their impact on Black women's experiences in the workplace."); *see also id.* ("An example of this type of potentially unintentional discrimination might be consistent expectations that women colleagues serve as the notetaker in meetings regardless of their role within the organization or the fact that notetaking should be gender neutral."); *see also id. at 5* ("Black women also face greater scrutiny and are more likely to be criticized for their performance than White people *or Black men*.").

[3] The Court understands that *Daubert*'s reliability standard is often applied to social scientists, not just hard scientists, and that social scientists should be permitted to proffer opinions if: (1) they demonstrate the same intellectual rigor demanded by *Daubert*; (2) their opinions are within their special skillsets or experiences; and (3) their opinions would assist the jury determine a fact in issue. *E.g.*, *Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996).

excessive work and remote work claims, Dr. Weiner's proposed testimony seems far less relevant or helpful to a jury. Plaintiff's only remaining discrimination claims—disparate pay and failure to promote—are supported by concrete, case specific evidence that the jury can easily understand. After all, race discrimination in the workplace is not unfamiliar to the average American and is therefore something that is well within a jury's "everyday experience." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1318 (11th Cir. 2022).

Ultimately, though, the Court's decision is not based on Dr. Weiner's credentials or the reliability of her opinion. Her opinion is simply overbroad and would inject irrelevant, un-pleaded, and unexhausted theories of discrimination into this case. Accordingly, Defendants' *Daubert* motion must be granted.

**C. CONCLUSION**

For these reasons, Defendants' motion for summary judgment (Dkt. 33) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is granted to Defendants as to two of Plaintiff's disparate treatment claims: namely, that she was given more work than her white colleagues and she was denied remote work when her white colleagues were not. Summary judgment is denied in all other respects. Plaintiff's disparate pay, failure-to-promote, and retaliation claims will all proceed to a jury trial.

Moreover, Defendants' motion to exclude the opinions of Dr. Weiner (Dkt. 35) is **GRANTED**.

The Clerk is directed to provide a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ordered.

Entered this 23rd day of October, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE